## THE STATE v. JAMES CRABTREE, Appellant.

### Division Two, December 16, 1902.

1. **Murder:** DEFENDANT'S GUILTY AGENCY. It is not sufficient to show that murder was committed, that is, the *corpus delicti;* but the defendant's guilty agency in the production of the crime must be established.

2. ————: MOTIVE. The absence of a motive to commit the crime with which the defendant is charged is a circumstance in favor of his innocence which the jury can consider. But a failure to prove a motive will not avail if the defendant's participation in the crime is otherwise sufficiently established.

3. ————: CIRCUMSTANTIAL EVIDENCE: PROOF OF INDEPENDENT FACTS. In an endeavor to prove defendant's guilt of murder wholly by circumstantial evidence, it is a fundamental principle of law that each independent fact must be proved in the same satisfactory manner as if the whole issue rested upon the proof of that fact.

4. ————: PRESUMPTION OF INNOCENCE OVERCOME. The presumption of innocence is not overcome by strong suspicion or conjecture. The law requires proof beyond a reasonable doubt.

5. ————: INSUFFICIENT EVIDENCE: FACTS STATED. An innocent girl sixteen years old, defendant, his father, brother and her cousin and three of her father's children had worked all day on the 27th of May in the field together, and returning to her father's house with them a few minutes after six o'clock she went twice two hundred yards for buckets of water, and brought them to the house, and then stated to her father's wife (whether her own mother or not does not appear) who was defendant's sister, that she would bring in some wood, and started towards a bluff over the river, two or three hundred yards distant, passing and smiling at her cousin as she

State v. Crabtree.

went, and was never seen alive again. The neighbors were notified of her absence about ten o'clock, and her father, who was four miles from home, about midnight; about noon of the second day her body was found in an eddy of water five or six feet deep, hard insoluble blood on her lip, her neck broken, and other things clearly indicating she had been violently murdered before being placed in the water. Had she jumped or been pushed over the bluff her body would have remained on the land. The day before her body was found two men had carefully examined with hooks the very spot where it was finally found. Blood was found on the path leading from the house to the river and on the bluff. An old lady a mile away heard a loud distressing cry, but two neighbors at no time more than a quarter of a mile distant, heard nothing except defendant's brother singing. Defendant, who was near the house when she was bringing the water and either just before or after at the river watering the horses near where her body was found, reached his own home about dusk and accounted for himself at all times between leaving the field and that time. Although defendant tried to explain the blood spots on the bluff by saying he had killed some snakes there and thrown them away, and again by attributing them to decayed persimmons, yet no blood stains were found on his person. No motive was shown for the crime. There was no evidence of any quarrel or unpleasant word or relation between her and her own relatives or defendant or his relatives. Nothing to suggest a conspiracy. She had no property and was helpful in her father's house. No stranger was seen in the neighborhood, although the opportunity to have seen one had he appeared was good. *Held*, that while the *corpus delicti* was clearly shown, yet there was nothing but conjecture to connect defendant with it, and a verdict of guilty must be reversed because of insufficiency of evidence on which to base it.

Appeal from Stone Circuit Court.—*Hon. H. C. Pepper,* Judge.

REVERSED AND REMANDED.

*T. L. Viles* and *Harrington & Wadlow* for appellant.

(1) The verdict is not supported by the evidence, and should not stand. State v. Nesenhener, 164 Mo. 461. (2) The evidence merely raises a suspicion of guilt and can not support a conviction. State v. Ballard, 114 Mo. 634. (3) Instruction 11, given by the

trial court, does not clearly state the law, the defense being an alibi. The trial court should have instructed the jury that it devolved upon the State to show beyond a reasonable doubt that the defendant was present at the time and place of the commission of the crime charged. State v. Tatlow, 136 Mo. 678; State v. Harvey, 131 Mo. 339; State v. Taylor, 118 Mo. 153; State v. Woolard, 111 Mo. 248; State v. Howell, 100 Mo. 628. This case is based upon circumstantial evidence alone. The evidence does not tend to establish the fact that deceased was murdered. The evidence does not connect the defendant with the crime charged. On the contrary, the evidence is that the deceased and defendant separated shortly after six o'clock on the evening deceased disappeared, and that they were friends and in a friendly mood at that time, and were not seen together again. The State did not prove any motive for the crime charged.

*Edward C. Crow*, Attorney-General, and *Jerry M. Jeffries*, for the State.

The evidence of defendant's guilt in this case is purely circumstantial. We think it is clearly shown that Alice Stallions was murdered either by being choked to death or by having a heavy blow dealt her upon the neck, and that after she was murdered her body was thrown into the river. The evidence shows clearly that Alice Stallions was murdered, her body thrown into the river and that this crime was committed at the close of day after the young lady had spent the entire day in the field pulling weeds and dropping corn, had gone to her home and there went about doing her chores, suddenly disappeared, was murdered and thrown into the river before the very eyes of four persons charged with her murder. It is such a chain of circumstances that the jury must have believed that the defendant, together with William Crabtree, Thomas Crabtree and Mattie Stallions committed the act. Such a chain of facts was woven around them by the evidence

in the cause that beyond question they all or
some one of them committed the terrible crime and if
any one of them did the act then the remainder of them
know which is the guilty one, and knowing this and not
speaking out, they must have aided and assisted in the
crime.   The chain of circumstantial evidence in this
case is so broad that one in reading the entire transcript
of the record can not fail to notice how at every point
the evidence of the defendant's guilt draws closer and
closer around him until the verdict of the jury declares
he is guilty.   We believe there is ample evidence upon
which to base the verdict and the judgment.

GANTT, J.—At the October term, 1901, of the
circuit court of Stone county, the prosecuting attorney
of said county, under his official oath, filed an infor-
mation charging William Crabtree, Thomas Crabtree,
James Crabtree and Mattie Stallions with the murder
of Alice Stallions, on the 27th day of May, 1901, at the
county of Stone, with a certain blunt instrument, the
dimensions of which were to said informant unknown.
The Hon. George H. Thornberry, the regular judge
of that circuit, being disqualified because he had been
of counsel for defendant prior to his appointment, the
Hon. Henry Clay Pepper, the regular judge of the
Twenty-fourth Judicial Circuit, was regularly called
and requested to try the case on the 5th day of Novem-
ber, 1901, at the October adjourned term of the Stone
Circuit Court.   Judge Pepper agreed to try the cause
and appeared at the appointed day.

The prosecuting attorney elected to prosecute for
murder in the second degree, and on the motion of
defendants, a severance was granted and James Crab-
tree was put on his trial.   A plea of not guilty was duly
entered, and a jury impaneled.   No objections were
made to the panel.   The jury found the defendant,
James Crabtree, guilty of murder in the second degree
and assessed his punishment at ten years in the State
penitentiary.   From the sentence imposed on that ver-
dict he appeals to this court.

Two grounds are assigned for reversal, an error in an instruction on the law of alibi, and the insufficiency of the evidence to sustain the conviction.

The State relied entirely upon circumstantial evidence. The proofs developed the following facts:

Miss Alice Stallions resided with her father's family in Stone county, Missouri, about five or six miles below Cape Fair, near what is locally known as Cedar Hollow near the Stallions Ford on the James river. Alice Stallions was a girl about sixteen years old. John Stallions, her father, lived on a bluff above the river and was a farmer. His family on the 27th of May, 1901, consisted of himself, his wife, Mrs. Mattie Stallions, Alice Stallions, his daughter, twin babies about three months old, Lulu Stallions, a daughter, and Alex. Stallions, a son, a young boy. John Stallions's wife, Mattie Stallions, was and is the daughter of Thomas Crabtree and a sister of defendants James Crabtree and William Crabtree, all co-defendants in the information. Thomas Crabtree and his sons and their families all resided in the immediate neighborhood of John Stallions. The record is silent as to whether or not Alice Stallions was the daughter of Mattie Stallions.

On May 27, 1901, John Stallions, the father, was absent from his home, working for Byron Carr, who lived about four miles distant. On that day Thomas Crabtree, William Crabtree, James Crabtree, Ben Morris, commonly known as Ben Crabtree, Luke, Alice and Lulu Stallions, were all at work in a field of John Stallions planting corn. Thomas Crabtree drove a harrow, with two mules, James Crabtree laid off the corn ground, Alice dropped corn and William covered it. Ben Morris, Luke and Lulu pulled weeds. All that day Alice had worked in that field. In the morning she worked in a potato patch. They all ate dinner at John Stallions's house. After dinner she dropped corn. About six o'clock that evening, they all quit work.

When they quit work the evidence tends to show that William Crabtree, Ben Morris and George Stallions went to the river under the bluff to water their teams. William Crabtree was riding one of the plough horses and leading another, and Ben rode one. Thomas Crabtree, James Crabtree and Lulu and Alice Stallions all walked up to the house of John Stallions, where Mattie, his wife, and little children were. After Alice reached the house, she immediately got two buckets and went to the spring some two hundred yards distant and brought two buckets of water and then returned and got another bucket. After bringing this water, there was evidence that she hung up her bonnet and went out of the rear door of the house, and as she started said, "Mattie, I will go and get an armful of wood," and started to the bluff overhanging the James river. As she left, she smiled at Ben Morris, alias Crabtree, as she passed him in the yard.

The State was unable to produce any witness who ever saw her alive after she started for the wood. This was Monday evening, May 27, 1901. On Tuesday morning information was given out through the neighborhood that Alice was missing. This was reported at her uncle Rube Stallions's at breakfast time that morning.

John Stallions, her father, testified that the word reached him in the night of May 27th after he had gone to sleep at Byron Carr's. He couldn't tell the exact time. Carr lived four miles distant from John Stallions's. He says that William Crabtree and Albert Edwards brought him the information. Edwards testified that William Crabtree came to his house and told him five minutes after ten o'clock that night. He lived a mile and a half from James Crabtree's. They reached Byron Carr's about eleven o'clock that night.

Unavailing search was made on Tuesday for the missing girl. The James river was dragged with hooks and poles Tuesday and Tuesday night till about midnight, when all parties quit until next day. On Wednesday about noon her dead body was found in the

James a short distance from the end of the path which led down the bluff from the house of John Stallions, on the hill above. When found her arms were folded across her breast. Her eyes and mouth were closed and her neck was broken. Dr. L. Henson, a physician of Galena, a graduate of the Missouri Medical College of St. Louis, of the year 1883, testified that he was called to examine her dead body and found her neck dislocated or broken between the axis and the atlas, or the first and second vertebrae. Dr. Donaldson, a practicing physician of Cape Fair, but not a graduate also examined the body and testified the neck was broken, at the second cervical vertebrae. Her eyes were closed and her lips slightly parted. From the examination made by these physicians and upon hypothetical questions based upon the position of her arms, her mouth and her eyes, and the other facts developed by those who lifted her out of the water, these physicians both gave it as their opinion that she was dead when she was placed in the water, and her death had not been caused by drowning. The evidence was that the water was five or six feet deep where she was found and the highest point from which she could have thrown herself in the river near there was the top of a rock which stood about twelve inches above the water. That she could have broken her neck by jumping off of this rock into water as deep as that was at that place was incredible.

She had no gravel, stone or trash in her hands, but her arms were folded over her breast. On her neck was found a bruised place an inch or two in width, but the skin was not broken. The evidence was that a blow at that point could have broken her neck. Her lower limbs were slightly drawn upward. On her lip was found some dry blood, which only yielded to hard rubbing with a wet cloth. The physicians were of opinion that had this blood resulted from a fall against a rock after she fell or was placed in the river, it would not have coagulated, but would have been dissolved and washed away by the natural action of the

water in which she was submerged. There was evidence that blood spots were found in the path near the river and on rocks in the path leading down from the house of John Stallions to the river. There was also testimony that blood and imprints answering to the size of a human body were found in the sandy loam under a ledge of rock under that bluff.

There was also positive evidence by two at least of those who searched the river on Tuesday for her body, that they sounded the exact spot in the river, which was in an eddy of still water between the rocks on the left side of the river, with poles and hooks and that if her body had been in there then they would have discovered it.

The non-expert witnesses, the neighbors who assisted in taking the body out of the river, and the ladies who washed and prepared the body for burial, all testified the neck was broken and the crepitation palpable, when they moved her head in washing and dressing her.

Without recapitulating at length all the evidence, we may say that the testimony most satisfactorily established that Alice Stallions was not drowned, but came to her death by violence and that *rigor mortis* had intervened before she was placed in the river. In a word, the *corpus delicti* was clearly proven. The evidence amply justified the jury in finding that the girl had been murdered and placed by her murderer or murderers in the river after she was killed.

The theory of suicide was rebutted by all the facts and circumstances in evidence. There was no reasonable hypothesis upon which to conclude that this apparently happy, smiling young girl had gone from her home that evening and without any conceivable motive or cause drowned herself, and there was no reason for reaching the opinion that she could have broken her neck as it was shown to be. Had she fallen from the bluff and broken her neck, her body would have been found on the land, as the bluff stood back too far for it to have fallen in the water, and of course

as death would have ensued almost instantly by the severing of her spinal column it must have remained where it fell.

Neither is there the slightest evidence of any stranger having outraged her and thrown her body into the river. With relatives and friends all around that immediate neighborhood; uncles and cousins watering their horses near where the homicide must have occurred that evening, with a neighbor boy watering his team on the opposite bank, no stranger was seen or heard of in that vicinity that evening or the next day. We should not omit to state that Mrs. Gore, a lady seventy years of age, who lived on the ridge about one mile from the house of John Stallions, testified that about one hour before sundown on Monday, she had just returned from gathering some yellow root to make some medicine for her grandchild, the child of Baker Thompson, and as she stopped in the yard, she heard a loud, terrible scream from a woman, followed by a lower one, both in the direction of the bluff near which the body of Alice Stallions was found.

That Alice Stallions was murdered, we think the evidence sufficiently established. The *corpus delicti,* the proof of which is essential to sustain a conviction, consists of a criminal act; this was shown, but to sustain a conviction there must be proof of the defendant's guilty agency in the production of such act. [3 Greenleaf, Ev., sec. 30; People v. Palmer, 109 N. Y. 113; Wharton's Crim. Ev., sec. 325; State v. Dickson, 78 Mo. 447; State v. Jones, 106 Mo. loc. cit. 312.]

So that while the evidence of the *corpus delicti* was most convincing in this case, in that the dead body was found, and conclusively identified, and the farther fact that her death was not the result of accident or suicide, but was caused by external violence by some criminal agent by which her neck was dislocated, still before the conviction of this defendant can stand, his guilty agency in compassing the death of Alice Stallions must have been established either by direct evidence or by facts and circumstances so cogent and convincing as

to exclude any other reasonable hypothesis. As already stated, the State did not produce any direct evidence of defendant's guilt, but asked a conviction on circumstantial evidence alone. We are thus brought to a consideration of the inculpatory evidence of defendant's having participated in this crime.

On the part of the State no ill-will or malice was shown. The deceased was a young girl only sixteen years old. There is not the slightest evidence of any quarrel or of bad feeling, and not the remotest hint that defendant would or could have profited in any manner by her death. Neither is there anything to suggest that she was in possession of any knowledge which would incriminate him or any of his relatives. So that we start our investigation with the concession that no motive for the crime on his part was disclosed in evidence, and the learned trial court instructed, and properly so, that the evidence disclosed no motive on the part of the defendant to commit the crime with which he was charged, and that the absence of such a motive was a circumstance in favor of his innocence which the jury should consider. On the other hand, a failure to prove a motive will not avail if the defendant's participation in the crime is otherwise sufficiently established. [State v. David, 131 Mo. 397.] Murder is none the less murder because the motive therefor can not be ascertained, nor impossible because there is no motive whatever. [State v. David, 131 Mo. 398, and cases cited.] The State proved that the defendant and Alice Stallions worked together on the day of the homicide, in her father's field, which the defendant, his father and brother, were cultivating for him that year. Alice was last seen alive, according to the testimony, about sundown, starting out, going in the direction of the bluff, for an armful of wood to get the family supper. Just prior to this, one of the witnesses testifies, defendant was at the house of the father of deceased, in company with his father, Thomas Crabtree, who was also the father of Mrs. John Stallions, and her little brothers and sisters. For the State it

is urged that, if the evidence of Mrs. Gore is credited, and of course this was the province of the jury, the defendant, his father, Mrs. Mattie Stallions and William Crabtree, who were in immediate proximity to the place from which that piercing scream was heard, necessarily would have heard it and if innocent, bearing the relation they did to the poor unfortunate girl, would have gone at once to her relief and summoned the neighbors to their assistance immediately, when she could not be found. It was shown by the State that William Black, a boy working for Mr. Pace, who lived just across the James river from the John Stallions place, came down to the river to set a trot line, when the sun was about one half an hour high, and saw William Crabtree riding one horse and leading another and driving two others and singing, and saw the defendant James Crabtree sitting there on a rock in the path that comes down from Stallions's house, and when William came up the defendant mounted one of the horses, and after they watered the horses they both rode away. He heard no screams or noises except William Crabtree's singing. Mrs. Gore fixed the time at an hour before sundown. The almanac introduced in evidence showed that the sun set on that day at 7:13 o'clock.

Another witness for the State, George Stallions, a cousin of Alice, testified that on the afternoon of the homicide he left his father's house at six o'clock, or about that time, got a horse and rode down by the place of John Stallions and passed Thomas Crabtree, James Crabtree, the defendant and Alice, about one-half mile from John Stallions's house and one hundred yards from the field in which they had been working. They were walking to John's house, and the witness caught up with William and rode down the hill with him to the James river, and William then rode on back up to the house. Making a reasonable allowance for this witness to go to his home, catch his horse and ride over a half mile to the place where he saw the defendant and the others coming out of the field, the sun would have

been not exceeding a half to three-quarters of an hour high when he passed defendant. But it is to be noted that he did not see defendant at the river when he and William watered their horses and thus his evidence conflicts with William Black.

James Pace, for whom William Black worked, was plowing about 150 or 200 yards from the path coming down from the Stallions house to the river until six o'clock, and the remainder of the evening was at his home about one quarter of a mile distant, and he heard no screaming, and his wife testified to the same effect. They both deny that William Black went down to the river to set trot lines that evening. As Alice Stallions did not leave the field until after six o'clock, and then walked home about a quarter of a mile, and after that made two trips, walking to the spring two hundred yards distant after water before she left the house for wood, it is extremely improbable that the scream which Mrs. Gore heard an hour before sundown was made by Alice. Neither is it at all probable that a scream so piercing could have failed to attract Pace and wife and William Black who were never over a quarter of a mile distant during all the time, from six o'clock to dark, and a portion of the time within two hundred yards of the bluff. If not heard by these disinterested witnesses, how can it be assumed that defendant heard it?

The other incriminating evidence as to this defendant is that when various persons discovered the blood spots on the river bank and in the path up the bluff, he insisted they were not blood but persimmon juice or the blood of two snakes he had killed, and thrown over there. It is forcibly argued that persimmon juice at no time has any strong resemblance to human blood, and absolutely incredible that in the last days of May the persimmons of the previous year would exude a fluid like blood, or that the green and immature fruit of that year would or could produce a fluid the color of blood. Neither could there be found any evidence whatever of the dead snakes. The anxiety of defend-

ant to find other substances like that which the other witnesses pronounced blood spots, excited more or less suspicion. The evidence of a blood spot on a quilt in the house of John Stallions, it would seem, should have little probative force, inasmuch as the testimony disclosed that Mrs. John Stallions had been delivered of twin children only three months prior to the death of Alice, and the family was so abjectly poor that they didn't have enough bed clothing for a change of her bed, and all of their bed clothing was more or less stained by the hemorrhages which attended the birth of her children.

We have noted these facts, as they were made prominent on the trial, but in our opinion no one of them or all of them combined are inconsistent with the innocence of the defendant. When it was shown by the incontrovertible evidence of the father of Alice Stallions that the defendant and his father and brother were cultivating the land for John Stallions that year, and by all the disinterested testimony that these were planting corn there on the 27th of May, 1901, their presence there is entirely consistent with their innocence. When it is recalled that Mrs. Mattie Stallions, the wife of John Stallions, was a sister of defendant, and that defendant and his brother, for convenience, left their plow gear at the Stallions barn, their presence at the house is no cause even for suspicion. As to the testimony that defendant was at the river when his brother rode the plow horses down to water them, it is a fundamental principle of the law of circumstantial evidence, that each independent fact must be proved in the same satisfactory manner as if the whole issue rested upon the proof of that fact. [Com. v. Webster, 5 Cush. 295; 1 Starkie, Ev., 510.]

It can be said as to the evidence of William Black, alias Willie Graves, that he is contradicted by George Stallions and by Mr. Pace and his wife, who testify that William did not go to the river that afternoon to set trot lines and was only gone about fifteen minutes watering his horses, and that owing to the underbrush

he could not have seen James Crabtree sitting at the point at which he says he saw him. But all the other evidence concurs in establishing that the defendant was busy laying off corn land until about six o'clock that afternoon; that when they quit work he walked on up to the house of John Stallions and after a short time went into the clover field and began pulling clover for his horse and when his brother William returned from the river, he also pulled clover until they each gathered a sack full, and they then mounted their horses and took the clover and rode around the road to their respective homes, defendant's home being a mile and a half distant. He reached there about dusk. So that young Black or Graves could readily have been mistaken. These circumstances which are as consistent with innocence as with guilt, prove nothing at all so far as establishing the guilt of the defendant.

Finally, the case resolves itself into this state of facts:

A young and innocent girl who has labored all day in her father's field until about six o'clock, quits with the other laborers and goes to the house. She cheerfully takes two buckets and goes to the spring some two hundred yards distant, and brings water to pour into a hopper. This done she takes another bucket and goes to the spring a second time and returns with another bucket of water. All day long she has performed every duty of her simple, useful life, without a murmur and without reproof from either of the adults who worked with her in the field, or her brother or sister. Her cousin, who passed her as she left the field for the house, testifies that she was jolly and smiling. After bringing the water, unasked or undirected, she started out, saying she would go and get an armful of wood, obviously for cooking purposes. She went in the direction of the bluff which bounds the James river on her father's farm, and only some two hundred yards distant. She did not return as early as she was expected. Her body was found at the bottom of the James river opposite her father's place on

the second day after her disappearance that evening. Her neck was broken. From the fact that she was evidently killed in the immediate neighborhood of her father's house and this defendant, his brother William Crabtree, and their father Thomas Crabtree, and her father's wife, the sister of defendant, were the persons on the farm and at the house when she left, with the proof of the facts already detailed, it is insisted her violent death is traceable to them. No motive for such a crime was developed. No ill-will was shown. No proof of any threat by either of the defendants was shown. No evidence of a conspiracy was offered or suggested. If she was slain by these parties, which one struck the murderous blow? We are left entirely in the dark. In lieu of evidence, we have conjecture only. No blood spots were found on the clothing of this defendant, and yet if his hand struck the murderous blow and if the State's theory is correct, he did not at once take her body to the river and throw it in, but took it up and hid it under a ledge until Tuesday night, and if he did this the probabilities are at least great that as her head hung over, some blood from her nose or mouth would have dropped on his clothing.

One of the usual indicia in cases of this kind is the failure of the accused to account for himself, but in this case, evidence is given by him of every step he took, and every act he performed from the time he removed the gearing from his team until he reached his home that evening at dusk. Outside of the conjecture that he could have hurriedly followed Alice Stallions, struck her the fatal blow and then hid her body and as hurriedly returned to the clover patch and gathered his clover and gone to his home, there is nothing to sustain the charge against him.

But if we indulge in this surmise as to James Crabtree, why not do the same as to either of the other adults, Thomas Crabtree or William, because they were equally as well situated, so far as opportunity was offered, as was James. What could the most innocent man on earth have shown to refute this charge, than

this prisoner did? With no motive to murder or harm the poor innocent girl, no evidence of any ill-will and apparently no ground on earth for any, why should he have killed her. In no event could her death have profited him. She had no estate, and her services to his sister's family were valuable, as even the slight glimpse we get of that humble abode fully discloses. Unless his father, his brother and his sister were all into the conspiracy, the danger of detection was imminent as a search would necessarily follow, and if he had gone in the direction of the bluff immediately after Alice had started the children and the others would necessarily have seen him.

The only colorable theory of the defendant's guilt is that which assumes that without any motive or evidence of dislike, these grown men and the girl's father's wife were so lost to all natural instincts as to have conspired to kill this young, inoffensive, joyous creature who was powerless to injure any of them.

Prone as we are to yield to the finding of a jury on an issue of fact, as much as we are disposed to yield to the judgment of the judge who presides at the trial, we are irresistibly forced to the conclusion that there was no sufficient evidence to justify the verdict in this case. Every fact testified to in the case is as compatible and consistent with defendant's innocence as with his guilt. The presumption of innocence is not to be overcome by even strong suspicions. The law in its mercy, and in view of the numerous well-authenticated cases of the conviction of innocent men and women, requires proof beyond a reasonable doubt. We are not insensible to the necessity of proving crime by circumstantial evidence. It is obvious that society would be at the mercy of the criminal classes if direct proof were always required, but we are prepared to say that the evidence must go beyond mere suspicion and conjecture. It may be that this defendant was a participant in the murder of Alice Stallions, but in our opinion the evidence in this record is not sufficient to show

that he was, and after a most careful consideration of every item of the testimony, we are constrained to reverse the judgment and remand the cause, and it is so ordered.

All concur.