STATE of Missouri,
Plaintiff-Respondent,

v.

Robert Lee MORRIS,
Defendant-Appellant.

No. 10180.

Missouri Court of Appeals,
Springfield District.

Feb. 22, 1978.

Motion for Rehearing or Transfer
Denied March 28, 1978.

Application to Transfer Denied
May 9, 1978.

Gregory K. Johnson, Springfield, for defendant-appellant.

John D. Ashcroft, Atty. Gen., Philip M. Koppe, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Before HOGAN, P. J., and NORTHERN and MOORE, Special Judges.

HOGAN, Presiding Judge.

Defendant Robert Lee Morris stands convicted of murder in the second degree as defined and denounced by § 559.020, RSMo (1969).[1] A jury has assessed his punishment at imprisonment for a term of 30 years. Defendant appeals, contending (1) that the evidence does not support the verdict, and (2) that the trial court erred in admitting six color photographs of the victim taken after her death. After prolonged consideration, we find no merit in either point.

The victim of the homicide, Kimberly Ann Matney, was the 11-month-old daughter of the defendant's paramour, Carol Jean Matney, or Carol Jean Letterman. Kimberly was admitted to the emergency room at a large general hospital in Springfield, Missouri, about 4:00 p. m. on March 18, 1975. The victim was received in cardiac arrest. By the use of heroic measures a heartbeat was restored. The victim's life signs were sustained mechanically for about 24 hours, whereupon she was pronounced dead. This prosecution followed.

■ The State's case is wholly and entirely circumstantial and in consequence a detailed recitation of the evidence is necessary. It must be borne in mind, however, that even when the State's case is entirely circumstantial, all evidence upon the whole record tending to support the guilty verdict must be taken as true, contrary evidence must be disregarded and every reasonable inference tending to support the verdict must be indulged. *State v. Lee,* 556 S.W.2d 25, 32[13] (Mo.banc 1977); *State v. Cobb,* 444 S.W.2d 408, 412[3] (Mo.banc 1969); *State v. Sykes,* 372 S.W.2d 24, 26[3] (Mo. 1963).

So considered, the evidence shows that on Monday, March 17, 1975, a Mrs. Mary McClary "baby-sat" with the infant victim. Mrs. McClary observed burns on the child's body. Mrs. Matney or Mrs. Letterman, to whom we shall refer as the mother, told Mrs. McClary that the child had fallen on a coffee table and had struck her eye and head; the victim had sustained the burns when she was put "in water" to alleviate the soreness resulting from the fall. Otherwise, the substance of Mrs. McClary's testimony was that the victim was a "good baby" who cried only when she was picked up or moved.

The State's principal witness to the events which immediately preceded the victim's hospitalization was the child's mother. The mother's testimony was that she met the defendant "[A]bout a week before Christmas [1974]" at "Jesse's Club," a tavern or bar. Defendant "moved in" with the mother a few weeks after they met and the two were living together on March 18, 1975. It is fairly inferable that the mother was regularly employed at "Davis Nursing Home" from late February up to the time of her child's death. She usually worked from 7:00 a. m. to 11:00 a. m. or from 7:00

---

1. References to statutes and rules are to RSMo (1969), V.A.M.S. and V.A.M.R., except where otherwise noted.

a. m. to 3:00 p. m.; the defendant regularly took her to work and the child was left with the defendant. The mother further testified that the child was only occasionally left with a baby-sitter; ordinarily, the child was kept by the mother and defendant except when "[the mother and defendant] would go out."

The evidence showed that the victim had sustained severe second-degree burns several days before her death. The mother explained these burns by saying that her child had fallen "out of the pickup seat" while she was being cared for by the defendant. The mother noticed that the victim's legs were swollen. She and the defendant decided to "soak" the child in "warm" water to relieve the swelling and apparent soreness in the child's legs. The child was placed in a dishpan, in warm water, and additional water was heated in a percolater. As the additional water was heated, it was added to that already in the dishpan. According to the mother "the water wasn't hot when I felt of it," but the victim was nevertheless badly scalded. The mother did not take her child to a physician, because the defendant had said "they would take her away from me if we did." However the scalding occurred, postmortem photographs of the victim vividly demonstrate that she suffered extensive burns over the lower part of her body, and especially the lower part of the left leg and foot, which appear to be denuded of epidermal tissue.

It was also demonstrated that prior to her death the victim had sustained bilateral fractures at the junction of the head and neck of the femur, i. e., both hips were broken. The mother's knowledge of these fractures was limited. She testified to two falls; the infant fell once between the seat and the door of the pickup, but the mother was sure "her legs weren't hurt in that fall." Defendant told the mother of another fall in defendant's pickup—the mother was not present—and thereafter the child's legs became swollen. As indicated, the victim was scalded thereafter.

Certain other evidence should be noted here. In rebuttal, the State produced one Lonnie Hargis as a witness. Hargis was acquainted with the defendant. Hargis testified that on one occasion, two or three weeks before the infant's death, defendant brought the child to Hargis' residence. Asked if he had seen defendant "do anything" to the child, Hargis stated "at one time the baby was sitting on the floor . . and he was rocking his [defendant's] foot back and forth and hit the baby in the head." Defendant kicked the victim "a time or two" and the victim cried. Hargis had not seen defendant "just haul loose and kick [the victim]." Hargis observed no burns upon the infant, but he did notice that she made no effort to creep—"just [sat] on the floor by the footstool."

Defendant's estranged wife testified that on occasion defendant had brought the victim to her house. This witness stated that when defendant had the victim with him, ". . . he usually put her in the middle of the bed and made her stay there." If the victim tried to move, the defendant ". . . would either smack her or throw her back in the middle of the bed." On one occasion when it was very cold, defendant left the victim unattended in the pickup; the witness felt obliged to bring the victim in from the cold.

Returning to the events of March 18, the mother was "off work" on her physician's advice. Apparently, the defendant left "home" for some time in the morning. Early in the afternoon, the defendant returned. He and the mother, accompanied by the victim, went to "Ruby's Roost," a local bar. They then went to the library and then to their residence, arriving there about 3:00 p. m. Defendant had inadvertently locked the front door and "had to go in through the window." Defendant opened the door; the mother took her child and laid her in bed. The child was then dressed in what the mother described as "[A] Raggedy-Ann print dress and red slacks." The "Raggedy-Ann print dress" has been filed here as State's Exhibit 11. It is a very small cotton jacket, stained and torn about the neck and down the front. The child was also wrapped in a blanket or quilt, filed here as State's Exhibit 13.

When the mother had put the victim in bed, she "turned around" and went outside to an outside toilet. Defendant came outside and asked the mother "where his beer was." The mother estimated she was out of the house "about five minutes." When she returned, she found defendant "[L]aying across the bed." Defendant said he had fallen and had hurt his leg. The mother started to assist the defendant, but defendant told her "to go help the baby, that [the victim] was the one that needed it." The mother went to her child; defendant "ran outside." The mother looked at her child, who ". . . vomited, she couldn't hardly breathe." The mother screamed; the defendant came back in the house and attempted to administer mouth-to-mouth resuscitation. Defendant turned cold water upon the victim and "yelled at her to fight." At the mother's suggestion, the victim was taken to the hospital.

As we have related, the victim was received at the hospital in cardiac arrest. Her condition, particularly ". . . the terrible second-degree burns . . . from the waist down" apparently prompted hospital personnel to summon police officers. The incident was investigated by a police officer who testified at length upon trial. Only part of his testimony is material here. The officer questioned both the mother and the defendant, obtained their consent to search the premises where they lived, and on March 19 did search the premises and seized several articles. In particular, the officer seized a 7 ounce "pony" beer bottle, introduced as Exhibit 17. The bottle is 5½ inches high and approximately 2½ inches in diameter at the bottom. A "pony" bottle of this species weighs 12 ounces when filled and 5 ounces when empty. The investigating officer testified he found Exhibit 17 eight to ten feet [away] from the [baby's] bed."

A good deal of medical and technical evidence was received upon trial. A pediatrician, who had treated the infant on a regular basis, gave evidence that he had seen the victim in his office on February 18, 1975, one month before her death. At that time, this physician found no evidence of any fractures or any burns or any abuse of the child. This physician was summoned after the victim was admitted to the hospital. He stated that the victim was being maintained with respiratory support at that time; there was a heartbeat, but the child was "nonresponsive" neurologically, which meant there was no appreciable brain activity. The witness had noted the burns, which he could not date exactly, but "in [his] best estimate" they were at least five days old, perhaps older. He was reasonably certain, medically, that the victim would not have been able to "sustain her life-giving processes" without the aid of the mechanical devices to which she was attached. A spinal tap performed after admission showed a large number of red blood cells in the spinal fluid; that indicated a "rather large intercranial hemorrhage."

A radiologist was called by the State. Upon request, this physician had studied and interpreted x-rays of the infant victim taken on March 18 and 19. The two plates with which we are concerned are x-rays of the victim's legs. They show four fractures. On both sides, right and left, there are fractures at the junction of the head and neck of the femur. In lay terms, both thighbones are broken in the hip joint. On the left side there is an incomplete fracture of the femur toward the knee joint and a complete fracture through the shin bone or tibia. The radiologist stated that an estimate of the age of fractures can be made by noting the presence of callus or evidence of healing. In a child the victim's age callus begins to appear seven to ten days after the fracture. The bilateral fractures of the hips indicated "some evidence of callus," and the witness concluded they were more than seven to ten days old, and could not have been more than three or four weeks old. The most likely mechanism of injury or cause of such fractures would be a twisting or shearing of extreme flexion of the thigh, a bending or twisting upward to the level of the shoulder. Such fractures could be caused by accident, but not by a single fall; the witness further testified he had made 30,000 to 40,000 x-ray examina-

tions in the course of his career and had never before seen such hip fractures in a child, although they frequently occur in elderly people. The mobility of the infant victim would be "severely restricted" by such fractures. With regard to the other two fractures, the radiologist stated "[A]ny fall or blow . . . " could have caused them. These fractures were recent; they showed no evidence of healing, but could have been as much as five or six days old.

A pathologist performed an autopsy upon the victim's body on March 19, 1975. This physician testified as follows: He was presented with the body of an infant reported to be 11 months old, but found the external development of the body to be more consistent with that of an infant approximately seven months of age; externally, the child had second-degree burns over both legs, anteriorly and posteriorly, and over both feet, both top and bottom; the child had a bruise on the left jaw and a bruise above the right ear. The witness noted external rotation of the legs, which he believed indicated bilateral fractures. The bruises, according to this witness, were at least two to three days old "and maybe less." Internally, this physician found what is called subdural hemorrhage and hematoma. The witness explained these findings by saying that the "dura" is a layer of tissue which covers the brain within the skull. "Subdural hemorrhage" means a collection of blood between the covering of the brain and the brain itself. In this instance, the autopsy surgeon found hematomas on both sides of the brain in the parietal area. Subdural hematomas are caused by rapid acceleration or movement of the skull, which moves the brain rapidly backward or forward within the skull. Small blood vessels, torn by the rapid movement, bleed into the space overlying the brain. An external force is required to cause a hematoma; such condition may be induced by a sharp blow with a blunt instrument. Physicians generally believe that a subdural hematoma occurs on the side opposite from that to which the force is applied, but such is not invariably the case. Sometimes there is no sign of external trauma, and skull fractures are seldom found with subdural hemorrhage. This physician stated unequivocally that "there's no doubt medically as to the cause of [the victim's] death. The cause of death was a subdural hemorrhage and hematoma." The witness was shown the small beer bottle seized by the investigating officer and was asked whether or not the external force which caused the victim's subdural hematomas "could have been inflicted by a blow with an object such as that." The witness answered "[I] would say if it was held tightly or securely that it could."

The State also had the evidence of a criminologist, rather cryptically identified as the "director of the Region II Crime Lab." This witness' "qualifications" were stipulated. He was shown State's exhibits 11, 14 and 17 and identified them as articles handed or given to him by the investigating officer.

Exhibit 14 is a small pillow upon which the victim's head was presumably lying when her condition became critical on the afternoon of March 18, 1975. The criminologist performed several tests on a sample reconstituted from a round, moldy stain found in the lower left corner of the pillow. The criminologist was able to say only that the pillow might have been stained with beer of the brand defendant was drinking at the time the infant's condition became critical; he "could not positively state one way or the other" whether the dried fluid on the pillow was beer or baby food. The characteristics of the sample examined were "consistent" with dried beer, but were also consistent with baby food or liquid.

The criminologist had also conducted a number of tests upon Exhibit 17, the "pony" beer bottle which the State vigorously contends was the murder weapon. This bottle had been seized by the investigating officer presumably because two tiny hairs, three-fourths of an inch to one inch long, were encased in a dried fluid or "caked material" adhering to the base of the bottle. The criminologist went to the mortuary where the victim had been taken after her death; there he obtained some

hair specimens to compare with those found adhering to the beer bottle. The witness first made a gross microscopic examination of the hairs stuck to the beer bottle. One hair was an animal hair. The other hair was "young hair, fine pigmentation," at least six weeks old and uncut. Comparison with the hair from the victim's head revealed that the human hair from the beer bottle and the hair from the corpse had "similar color, similar length [and] similar texture." The scale count was also similar. The witness was unwilling, however, to give a "positive opinion" whether the hair on the bottle was the same as that taken from the victim's head, despite the several points of similarity, including the scale count.

As for the "caked" or "dried" material found on the bottle, because of the "minimal" size of the sample he was able to reconstitute, the criminologist undertook only to determine whether the material was blood, human or other. The test was positive for human blood serum. The witness did add that other secretions, such as saliva or nasal secretion, would produce a positive result; however, the caked or dried material contained blood serum.

The criminologist's attention was also called to State's Exhibit 11, the small jacket referred to as a "Raggedy-Ann dress" by the mother. This jacket is torn down the front and shows an extensive stain around and under the left armpit. This stain was identified as blood by the criminologist, although he made no test to determine if the blood was human blood. Such is the substance of the evidence, recited in accordance with the principles first stated. Other evidentiary detail will be noted in the course of the opinion.

Preliminarily, we may say that in the course of adjudicating this appeal on its merits, we have examined a good deal of the current literature dealing with child abuse and homicide arising out of child abuse; our examination has been helpful in this case only to the extent that it indicates: (1) that the problem of child abuse is a problem of considerable magnitude; studies reported by Dr. Rowine Hayes Brown and associates in 1973 indicated that the annual number of child abuse instances in the United States may run as high as 500,000, and that approximately 10 percent of hospitalized child abuse victims will die from the injuries they have sustained;[2] (2) that criminal child abuse and homicide resulting from criminal child abuse is difficult to prove and usually must be proved circumstantially;[3] and (3) that when a child-abuse homicide is discovered and prosecuted, the enormity of the crime often provokes emotional over-reaction and consequently convictions of such homicide must be circumspectly considered by appellate courts.[4] We may say that we have most carefully read and digested the record in this case; we have personally examined those exhibits introduced in evidence, and we have concluded that no reversible error appears. We have reached this conclusion, we may add, upon the basis of principles firmly established in this jurisdiction, without resort to the questionable principles developed in other states in response to the problems of child-abuse homicide.[5]

To be specific, a proper disposition of this appeal requires consideration of the basic elements of any homicide case and a determination whether the evidence, taken as a whole, justifies the conclusion that these elements were established beyond a reasonable doubt. In any homicide prosecu-

**2.** Brown, et al., Medical and Legal Aspects of the Battered Child Syndrome, 50 Chi.-Kent L.Rev. 45, 46, 49 (1973); see also McCoid, The Battered Child and Other Assaults Upon the Family: Part One, 50 Minn.L.Rev. 1 (1965).

**3.** Comment, Evidentiary Problems in Criminal Child Abuse Prosecutions, 63 Geo.L.J. 257 (1974).

**4.** See J. McKenna, A Case Study of Child Abuse: A Former Prosecutor's View, 12 Am. Crim.L.Rev. 165, 167–168 (1974) [hereinafter cited as *McKenna*].

**5.** See, e. g., *People v. Jackson,* 18 Cal.App.3d 504, 95 Cal.Rptr. 919 (Cal.App.1971); *State v. Loss,* 295 Minn. 271, 204 N.W.2d 404 (1973); Comment, supra, 63 Geo.L.J. at 262–263 and nn. 33, 34.

tion, the State must prove both the corpus delicti and the criminal agency of the defendant. Corpus delicti in a homicide case consists of two elements: (1) the death of a human being, and (2) the criminal agency of another. The elements of the corpus delicti cannot be said to be established until it has been proved that the death was not self-inflicted, nor due to natural causes or accident. The State must further prove, as an additional element, a criminal act of the defendant (his agency) as a cause of the victim's death. *State v. Meidle,* 202 S.W.2d 79, 81 (Mo.1947); *State v. Joy,* 315 Mo. 7, 19–22, 285 S.W. 489, 494–496[8] (concurring opinion) (1926); *State v. Crabtree,* 170 Mo. 642, 650, 71 S.W. 127, 129 (1902). Nevertheless, all the elements of a homicide case may be proved circumstantially, *State v. Ross,* 371 S.W.2d 224, 225[1] (Mo.1963), the evidence which tends to prove the second element of the corpus delicti may also be relevant upon and tend to prove the defendant's criminal agency, *State v. Meidle, supra,* 202 S.W.2d at 81, *State v. Joy, supra,* 315 Mo. at 21, 285 S.W. at 495, and although the State has the burden to prove the defendant's agency beyond a reasonable doubt, that burden does not apply to every link in the chain of circumstances, but only to the whole issue. *State v. Tettamble,* 431 S.W.2d 441, 443 (Mo.1968); *State v. Ashbrook,* 11 S.W.2d 1037, 1039 (Mo.1928). A further, more general principle to be borne in mind is that the jury could believe all or none of the testimony of a witness or could accept it in part and reject it in part just as they found it to be true or false when considered in relation to other testimony. *State v. Wynn,* 391 S.W.2d 245, 247[1] (Mo. 1965).

The defendant's sufficiency point is not cast in terms of the basic elements of a homicide case, but as expanded and clarified on oral argument and by the "argument" part of his brief, consists of three commingled assignments of error. First, defendant asserts the second element of the corpus delicti was not proved because there is no substantial evidence that the victim's death was the result of a criminal act of another. Further, the defendant maintains that his criminal agency was not established.[6] Finally, defendant contends there was no evidentiary basis for a finding of premeditation and malice which, defendant says, differentiate second-degree murder and manslaughter. We shall consider the assignments seriatim.

As for the contention that the second element of the corpus delicti, i. e., the criminal agency of another, was not made out, we believe the defendant erroneously assumes that the only proof going to this element was the pathologist's testimony that a subdural hematoma "could" have been inflicted with Exhibit 17, the pony beer bottle. Defendant flatly admits in his brief that the victim died of subdural hematoma and hemorrhage; the State's obligation—with respect to the second element of the corpus delicti—was to show that the fatal injury was not self-inflicted, nor due to natural causes or accident. *State v. Meidle, supra,* 202 S.W.2d at 81. The pathologist testified, in effect, that subdural hematoma or cranial hemorrhage is not a naturally occurring phenomenon; ". . . it takes an external force." The spinal tap taken after the victim was admitted to the hospital showed a large number of red blood cells, indicating active cranial hemorrhage, and in our opinion, a recent injury.

**6.** Defendant presents this argument in terms of "causation," and we agree that the question whether one of several injuries (causes) for only part of which defendant was responsible, caused death, may be considered a question of "causation." See *State v. Tettamble,* 394 S.W.2d 375 (Mo.1965), vacated and remanded *Tettamble v. Missouri,* 386 U.S. 265, 87 S.Ct. 1034, 18 L.Ed.2d 42 (1967), affirmed and remanded *State v. Tettamble,* 431 S.W.2d 441 (Mo.1968), reversed and remanded *State v. Tet-*

*tamble,* 450 S.W.2d 191 (Mo.1970), affirmed *State v. Tettamble,* 517 S.W.2d 732 (Mo.App. 1975) [question whether the time of infliction of mortal injuries was shown]; *State v. Brinkley,* 354 Mo. 1051, 193 S.W.2d 49 (1946) [question whether skull fracture caused by defendant's blow or victim's staggering against a wall as a result of the blow]. We prefer to discuss the contention in the context of defendant's criminal agency.

The mother's evidence, already recited, was sufficient to support the inference that the injury was sustained while she was out of the house using the outdoor toilet. We realize, of course, that children do injure themselves, and if there is substantial evidence that the injury could have been caused by a fall while the child was at play, the criminal agency of another in causing the death may be left in doubt. See, e. g., *People v. Strohm,* 185 Col. 260, 523 P.2d 973 (1974), where there was medical testimony that the hematoma was not recent, and substantial evidence indicating it could have been sustained at play. Here, however, the medical evidence showing active hemorrhage at the time the child was admitted to the hospital was supplemented by evidence that the fatal injury was sustained while the child was lying in her bed suffering from extensive burns and immobilizing hip fractures. In our opinion, a jury could quite readily have found beyond a reasonable doubt that the fatal injury was not self-inflicted, nor due to natural causes or accident.

As to the criminal agency of the defendant, it is argued that there is no evidence from which it could be inferred that the defendant struck the victim. Defendant compares this case with *State v. Banister,* 512 S.W.2d 843 (Mo.App.1974), indirectly arguing that *Banister* sets a standard by which the sufficiency of the evidence must be judged. We do not disagree with the holding in *Banister, supra,* and we agree that the State's proof was stronger there than it is here. We do not agree that the evidence in this case is insufficient because the proof of defendant's agency is not as compelling as it was in *Banister,* nor do we believe the pathologist's testimony was inadmissible or wholly lacking in probative force because it was not as strongly corroborated as it was there.

Taken in sum, the defendant's argument that his criminal agency was not established amounts to an argument (a) that the time of infliction of the injury was not proved, and (b) there is no substantial evidence that the defendant struck the victim with Exhibit 17, the empty pony beer bottle. We shall consider these points separately.

The argument that the *time* of injury was not established is essentially the same argument advanced in *Tettamble* when the appeal was considered on its merits in 1968, *State v. Tettamble, supra,* 431 S.W.2d 441. In *Tettamble,* the victim was committed to the St. Francois County jail on June 25, 1963. He was not then physically sick. On the evening of June 26, defendant, a large man, required the victim to fight with other inmates. The victim did so. Later, defendant attempted to force a sodomitic act upon his victim; the victim refused. Defendant and other inmates fought with the victim. Finally, the defendant kicked the victim two or three feet, causing him to fall, hitting his stomach or midsection against a piece of channel iron two to four inches high. The victim died the next day of a fresh perforation wound in the stomach resulting in peritonitis. The injury was fixed as being 15 to 24 hours old. Upon autopsy, evidence of other injuries was found, indicated by bruises on the arm. A pathologist testified that the bruises revealed an injury three to five days old, whereas the stomach tissue revealed an injury much more recent, somewhere in the nature of 15 to 20 hours old. Defendant was found guilty of second-degree murder and his punishment was assessed at imprisonment for 99 years. If the sufficiency of the evidence to show the time of injury was not attacked directly upon the first appeal, *State v. Tettamble, supra,* 394 S.W.2d 375 (Mo.1965), it certainly was on the second appeal, and was ruled adversely to the defendant. *State v. Tettamble, supra,* 431 S.W.2d at 442–443[1, 2][3].

In the present case, a jury might reasonably deduce from the evidence that on the day prior to her death, the victim was suffering from severe, crippling injuries, but was not in critical condition. She was a "good baby" except when she was picked up. If the mother's testimony is accepted, the victim was in her care during the morning hours of March 18, and the mother denied striking the child at any time except to "spank her hands." During the early afternoon of March 18, the child was laid in

her bed with her clothing, particularly the "Raggedy-Ann dress" intact. The mother stepped outside for an interval which she estimated at about five minutes. The defendant remained in the house. There were beer bottles in the house, other than those purchased June 18. When the mother returned to the house, defendant said he was hurt, but told the mother to go to her child "the [victim] was the one that needed [help]." Within moments, the victim stopped breathing. And, while the defendant minimizes the evidentiary effect of the torn garment, we find the small, blood-stained jacket—Exhibit 11—very convincing evidence that *some* violence was done to the child while she was lying in her bed.

Further circumstances indicating that the child was injured immediately prior to being hospitalized are, as we have noted, the medical evidence of continuing hemorrhage upon her admission to the hospital, and the pathologist's testimony that as of June 19, the bruises found on the child's left jaw and above her left ear were "at most" two to three days old and perhaps less, while the burns, according to the pediatrician, were at least five days old, and the hip fractures were estimated to be seven to ten days old, or older. Without prolonging the opinion unconscionably, we hold that the evidence was at least as definite as that found sufficient to establish the defendant's criminal agency in *Tettamble, supra,* and contrary to defendant's assertion, definite enough to place the time of the fatal injury within the "time frame" hypothesized by the State.

A further, duplicative argument advanced by the defendant is that the evidence is wholly insufficient to permit an inference that Exhibit 17 was the murder weapon. We might dispose of this argument by observing that the accusative part of the information charged defendant with killing the victim "by beating and striking the said Kimberly Ann Matney," the instruction under which the jury specifically found defendant guilty submitted that defendant caused the victim's death "by striking her . . ." and, therefore, it was

not incumbent upon the State to prove the nature of the weapon, or indeed that any weapon was used. *State v. Lamborn,* 452 S.W.2d 216, 218[2] (Mo.1970); *State v. Rizor,* 353 Mo. 368, 374, 182 S.W.2d 525, 529 (1944). We prefer, however, to discuss the point very briefly; it illustrates the defendant's approach to the sufficiency of the evidence to establish his criminal agency.

■ The evolution and development of the so-called "exclusionary rules" has provoked the use of many advanced and tentative "scientific" methods of proof in criminal cases. The order of technology involved in this relatively simple case is almost incredible. Nevertheless, homicides were being proved circumstantially for many years prior to the development of the scientific procedures involved here, and the law does not require the degree of scientific certainty for which the defendant argues. It was shown in evidence that there were beer bottles in the house which defendant occupied with the mother. One such bottle was found eight to ten feet from the victim's bed. This particular bottle had some dried or caked material adhering to the base. Encased or stuck in the dried material were two short hairs, one of which was an animal hair. The other hair, a human hair, was similar in color, length, texture, pigmentation and scale count to a specimen taken from the victim's head. The criminologist was unwilling to give a "positive opinion" that the hair on the bottle was a hair from the victim's head, but that did not deprive his testimony of all probative force; the caked material on the bottom of the bottle, subjected to tests, was "positive" for blood serum, and while the criminologist did state that other human secretions might give such a positive result, the evidence indicating the beer bottle was the murder weapon was as strong and convincing as that held sufficient to identify the weapon used in *State v. Maxie,* 513 S.W.2d 338, 345[14] (Mo.1974), and was certainly as definite and positive as that held sufficient to identify the rock used as a weapon in *State v. Far-*

*ris,* 128 Mo. 447, 450, 31 S.W. 1, 2 (1895).[7] We believe, and hold that the evidence in this case was sufficient to establish both the agency of another and defendant's criminal agency as the cause of the infant victim's death. A case proved circumstantially need not demonstrate the impossibility of the defendant's innocence, and the circumstances proved need not be absolutely conclusive of guilt. *State v. Maxie, supra,* 513 S.W.2d at 343.

█ The defendant's contention that neither malice nor premeditation were shown is likewise without merit. The argument that premeditation could not be inferred from the circumstances may be set to one side; as long as the intent to strike the infant victim preceded the actual blow, premeditation could be inferred, because "premeditation," when defined, means "thought of beforehand for any length of time, however short." *State v. Baber,* 297 S.W.2d 439, 441[3] (Mo.1957), and Instruction No. 7, which was the specific basis of conviction,[8] makes no mention of premeditation. The sense of the contention made here by the defendant, as was true in *State v. Allen,* 530 S.W.2d 415 (Mo.App.1975), is that the evidence does not justify a finding of any intent to kill the infant victim.

In our opinion, the very reason for introduction of the evidence showing the child's serious injuries was to permit the State to carry its burden of proving legal malice and the intent to kill. In our view, the force of the evidence showing the defendant's attitude and disposition toward the infant victim was not to show a "predisposition" to injure his paramour's child; it simply went to negative the conclusion that the defendant might have been attempting to discipline the child lawfully. The defendant

was not interested in the child; the case does not belong to that class of child-abuse homicides in which death results from an immoderate attempt to discipline the child.

█ It may be true, as the defendant contends, that the victim's burns were accidentally inflicted, but certainly he was aware of those · burns, and sufficiently aware of their seriousness to advise the mother to conceal their existence. Likewise, the bilateral hip fractures may have been accidentally sustained, but the radiologist's testimony that he had "never" seen such injuries in an 11-month-old victim in the course of making 30,000 to 40,000 x-ray examinations, and his testimony that the hip fractures were most likely caused by twisting the leg backward even with the child's shoulders make it highly unlikely that these fractures were the result of a fall in a pickup. And, if one accepts the testimony of the mother that the child was very seldom cared for by others—as the jury could—then the defendant must have been aware of the injuries, if he did not inflict them. The legal malice necessary to conviction of second-degree murder may be inferred from circumstances even when a deadly weapon is not used; given the battered condition of the victim and the fact that the defendant must have known of her condition, the disparity in size and strength between the victim and her assailant was so great that malice could be inferred from the circumstances. *State v. Allen, supra,* 530 S.W.2d at 420[8]; *People v. Drumheller,* 15 Ill.App.3d 418, 304 N.E.2d 455, 457–458[2][3] (1973); *Hignett v. State,* 170 Tex. Crim. 342, 341 S.W.2d 166, ·168–169[2] (1960), 40 Am.Jur.2d Homicide § 268 p. 532 (1968).

---

**7.** The evidence in *Farris* was, 128 Mo. at 450, 31 S.W. at 2: "The two physicians who attended the deceased both testified that in their opinion he came to his death from a wound in the left side of the head, made with a rock or some such blunt instrument . . . [B]oth testified, also, that they took the rock found by witness Wonderly at the scene of the difficulty, and placed it in the fracture in the skull, and that the points and surface of the rock exactly fit the indentures in the skull . . . ."

**8.** Instruction No. 7 is literally MAI–CR 6.06, which represents to some extent a modification of traditional definitions of second-degree murder to require the inclusion of an intent to kill or do great bodily harm, as required in *State v. Chamineak,* 343 S.W.2d 153, 161[13–15] (Mo. 1961). See: Comments to MAI–CR, J. Scurlock, *Murder,* p. 18 (1973).

■ A final complaint is that the court erred in admitting six color photographs of the deceased victim. The defendant cites *State v. Floyd,* 360 S.W.2d 630 (Mo.1962), which states the law in scholarly fashion, but is factually inapposite here. We believe the photographs, which are admittedly gruesome, were properly admitted because they tended to demonstrate malice and reflect the state of mind of the defendant. See McKenna, *supra,* n.4, 12 Am.Crim. L.Rev. at 170, nn. 9–13.

We find no prejudicial error in any respect briefed or argued here and accordingly, the judgment is affirmed.

All concur.