STATE of Missouri,
Plaintiff-Respondent,

v.

Carol Jean LETTERMAN,
Defendant-Appellant.

No. 10725.

Missouri Court of Appeals,
Southern District,
Division Two.

July 30, 1980.

Rehearing Denied Aug. 22, 1980.

Theodore A. Strecker, Springfield, for defendant-appellant.

John Ashcroft, Atty. Gen., Eric Martin, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

HOGAN, Judge.

This appeal involves the infanticide reported in *State v. Morris*, 564 S.W.2d 303 (Mo.App.1978). A jury has now found defendant Carol Jean Letterman guilty of second-degree murder in causing the death of her child and has assessed her punishment at imprisonment for a term of 20 years. Defendant appeals.

In this court, the defendant has briefed eight or nine assignments of error, depending on how one subdivides them. Four of the assignments of error demand analysis and consideration. The others reflect admirable compliance with *State v. Gates*, 466 S.W.2d 681 (Mo.1971), but raise no meritorious issue.

The assignment of error which requires the most careful scrutiny is defendant's contention that her motion for judgment of acquittal, made at the close of all the evidence, should have been sustained. We now know that a criminal defendant has a due-process right to have the State present evidence from which any reasonable trier of fact can find the elements of the crime charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979). And, contrary to the State's assumption, the defendant is entitled to have this appeal considered without reference to the disposition of her coperpetrator's appeal. *State v. Swearingin*, 564 S.W.2d 351, 353–355[1–3][4] (Mo.App.1978). Nevertheless, the State is entitled to the most favorable construction of all the evidence and all reasonable inferences which may be drawn therefrom,

even though the proof of guilt is circumstantial. *State v. Lee*, 556 S.W.2d 25, 32[13] (Mo.banc 1977); *State v. Cobb*, 444 S.W.2d 408, 412[3] (Mo.banc 1969); *State v. Sykes*, 372 S.W.2d 24, 26[3] (Mo.1963). Nothing in *Jackson* alters that principle and the evidence will be summarized in the light most favorable to the result reached.

At the end of her short, miserable life, the infant female victim was almost 1 year old, measured 26 inches from heel to crown and weighed about 16 or 17 pounds. She was brought to the emergency room of a Springfield hospital about 4 p. m. on March 18, 1975, by the defendant and defendant's paramour, Robert Morris. Upon admission, the victim had no vital signs. Heroic measures were instituted and the victim was put in intensive care. The victim did not respond, and about 4:15 p. m. on March 19 she was pronounced dead.

The evidence is not the "same evidence" presented in *State v. Morris, supra* ; consequently the proof must be reviewed in some detail. .

The injury of which the victim died was described by her pediatrician as a "profound brain injury." A pathologist, who performed an autopsy on the victim, testified that his external examination of the skull revealed a bruise on the left jaw and another bruise just behind the right ear. When the pathologist incised the victim's scalp to pull the scalp away from the bony part of the skull, he observed fresh blood beneath the unossified anterior part of the skull, which is called a fontanelle. When the skull was opened to permit examination of the brain and the tissues surrounding it, ". . . it was obvious that there was hemorrhage and blood clot over the entire left side of the brain and on the . . . back part of the right side of the brain." Microscopic examination of the brain tissues indicated the victim's brain substance had been bruised on both sides, and the pathologist gave as his opinion that on March 19, when he performed the autopsy, the brain hemorrhage was "acute" which meant it "was of age three or four days or less." He also explained there was no nec-

essary correlation between the external bruises and the points of injury to the brain.

The victim's pediatrician had seen the infant at his office on February 18, 1975, about 1 month prior to her death. At that time, the pediatrician made a physical examination of the child by listening to her chest sounds, examining her ears, nose and throat and "looking at the child in general." It is a fair inference that the victim was then in good health, although she had a cold. The pediatrician prescribed a decongestant and made an appointment to see the victim again on March 1. The March 1 appointment was not kept but this physician did respond to an emergency call to see the victim at the hospital on March 18. When he arrived, the victim had an endotracheal tube in place, a species of gastric tube was in place and intravenous fluids were being administered by means of a "cut down." When the witness first saw the victim, she was "nonresponsive, . . . had no spontaneous movement, no reflexes present, the pupils were fixed, [and] were not reactive to light." The victim's appearance indicated a profound brain injury to this physician, and a spinal tap was made. The results indicated "central nervous system hemorrhage." Asked "[W]hat are we talking about?", this witness answered "We're talking about blood, other than just a subdural hemorrhage, blood in the subarachnoid space, blood from possibly somewhere else in the brain as well." The nature of the injury was such as ". . . would have to be produced by diffuse brain injury, more than just a subdural hematoma, bleeding into the material substance of the brain, in other words bleeding diffusely through the surface of the brain." The fatal hemorrhage was caused, in this witness' opinion, by external trauma. So, from the evidence we have just recited, a jury could reasonably conclude that the infant victim had been beaten or battered by or against some hard object—literally "brained"—shortly before her death.

The State presented evidence that the victim was suffering from several long-

bone fractures.[1] A radiologist had taken x-rays of the victim's lower extremities after her death. These x-ray plates are before us as State's Exhibits 12 and 13. Exhibit 12 was identified as an x-ray of the victim's pelvis and lower extremities. The radiologist identified four distinct fractures. On both the right and left side there were fractures at the junction between the neck of the hip bone and the hip bone itself. This witness testified that he had, in the course of his professional career, interpreted 40,000 to 50,000 x-ray series, and had never before seen such simultaneous fractures in a child the victim's age. His opinion was that the hip fractures were caused by the application of a twisting or shearing force, and he considered it "very unlikely" that these fractures were sustained in a fall. The presence of callus at the site of the hip fractures led this physician to believe they were more than 7 days old. The hip fractures would be very painful, and the victim would probably not be able to walk. The radiologist also pointed out two other distinct fractures shown by the x-rays. One was an incomplete fracture of the left femur or long upper leg bone just above the knee; the other was a complete fracture of the left tibia or shin bone. The witness' opinion was that the two fractures below the hip were sustained less than 7 to 10 days before the victim's death.

The prosecution also called a Mrs. McClary as a witness. On March 17, 1975, this witness had kept the infant victim at her home. She had noticed extensive burns on the victim's legs and had observed that the victim cried and seemed to be in pain if she was moved. Mrs. McClary repeated this testimony several times.

■ For convenience, we shall use the same method of analysis as was used in *State v. Morris, supra,* 564 S.W.2d at 308–309. In any homicide prosecution, the State must prove both the corpus delicti and the criminal agency of the defendant. The corpus delicti in a homicide case consists of two elements: 1) the death of a human being, and 2) the criminal agency of another. The elements of the corpus delicti cannot be said to be established until it has been proved that the death was not self-inflicted nor due to natural causes or accident. The State must further prove, as an additional element, a criminal act of the defendant (his agency) as a cause of the victim's death. *State v. Meidle,* 202 S.W.2d 79, 81 (Mo. 1947); *State v. Joy,* 315 Mo. 7, 19–22, 285 S.W. 489, 494–496[8] (Blair, J., concurring) (1926); *State v. Crabtree,* 170 Mo. 642, 650, 71 S.W. 127, 129 (1902). Nevertheless, all the elements of a homicide case may be proved circumstantially, *State v. Ross,* 371 S.W.2d 224, 225[1] (Mo.1963), and although the State has the burden to prove the defendant's criminal agency beyond a reasonable doubt, that burden does not apply to every link in the chain of circumstances, but only to the whole issue. *State v. Tettamble,* 431 S.W.2d 441, 443 (Mo.1968); *State v. Ashbrook,* 11 S.W.2d 1037, 1039[5] (Mo. 1928).

■ The evidence recited is manifestly sufficient to permit any rational trier of fact to find the first two of the three necessary elements beyond a reasonable doubt. The State's evidence concerning the cause of the victim's death on this trial was considerably different from its evidence concerning the cause of death in *State v. Morris, supra.* In the *Morris* case, the fatal hemorrhage was depicted as the result of a subdural hematoma, which may, on rare occasions, occur spontaneously; here, there is convincing medical evidence indicating that the victim died of extravasation from the substance of the brain itself, traumatic

---

1. There is evidence in the record concerning the mechanism of subdural hematoma, traumatic and spontaneous, and the combination of hematoma, long-bone fractures, multiple soft tissue injuries, poor skin hygiene and malnutrition which constitute the "battered child syndrome." Abstract discussion of homicides resulting from parental assault is inappropriate here. Those interested in the "battered child syndrome," if any, may consult Brown, Battered Child Syndrome, 50 Chi-Kent L.Rev. 45 (1973); McCoid, The Battered Child and Other Assaults Upon the Family: Part One, 50 Minn. L.Rev. 1, 3–19 (1965); Kempe, et al., The Battered Child Syndrome, 181 A.M.A.J. 17 (1962).

hemorrhage directly from the substance of the brain tissue. The fact that the pathologist found both sides of the brain had been bruised strongly suggests more than one blow had been struck. The numerous long-bone fractures speak eloquently against the possibility that the victim's injuries were either self-inflicted or the result of an accident.

■ The defendant's argument is, of course, that her criminal agency was not proved. It is again argued that *State v. Banister*, 512 S.W.2d 843 (Mo.App.1974), established a standard by which the sufficiency of the evidence must be judged, but we reject that argument here, as we rejected it in *State v. Morris, supra*. Bearing in mind that the *Morris* record created no species of issue preclusion favorable to the defendant, *State v. Swearingin, supra*, 564 S.W.2d at 354–355[4], and bearing in mind that the State was not obliged to prove that the defendant, as a coperpetrator, personally committed all the acts which constituted the essential elements of the crime charged, *State v. Colthorp*, 437 S.W.2d 75, 77[4] (Mo. 1969); *State v. Parcel*, 546 S.W.2d 571, 574[8] (Mo.App.1977), there was evidence from which any rational trier of fact could have inferred the defendant's agency beyond a reasonable doubt.

The pediatrician's testimony permits an entirely reasonable inference that the victim's injuries had been sustained over a period of 1 month prior to her death. The State had evidence, principally from the pathologist, that the victim had been severely scalded a short time before her death. A series of color photographs of the deceased victim were introduced in evidence; they were identified as accurate representations by a detective who investigated the case. They vividly demonstrate that the victim had recently sustained severe and extensive burns over the lower part of her body. The pathologist noted extensive second-degree burns on both the right and the left leg.[2] Those burns were described as being about 8 inches wide from

the toe to the hip joint on the right leg; there was also a second-degree burn which measured about 4 square inches on the victim's left shin and foot. There were first-degree burns on the victim's back.

This case was investigated by a detective with almost 18 years' experience as a peace officer. The officer was called to the hospital after the victim was admitted. He advised the defendant of her *Miranda* rights in one of the waiting rooms at the hospital; thereafter he had several conversations with the defendant during which he asked the defendant about the victim's burns. The defendant's initial explanation was that the victim had been injured 2 or 3 weeks prior to her death; one of her legs was "sprained" and defendant decided to bathe her daughter in epsom salts and hot water. Defendant heated some water in an electric percolator, put the child in a plastic dishpan and poured the water over the victim. At first, the defendant maintained she had tested the temperature of the water after she poured it in the dishpan and found it was "not hot to her touch." Subsequently, defendant admitted the victim cried aloud in pain upon being placed in the water and that her injuries were such that she and Morris agreed not to disclose them to a physician.

There was further evidence concerning the burns from Mrs. McClary, the babysitter. During the day on March 17, defendant telephoned Mrs. McClary and inquired about her daughter. Having noticed that the victim was severely burned, Mrs. McClary asked how she sustained the burns. Defendant answered that she had put her daughter "in the water" to relieve the effects of a fall; she had placed her daughter in the water twice, and had removed her when she "turned sort of a pink color." Mrs. McClary also noticed that although the victim's legs were bandaged, the bandages were "matted down into [the victim's] little legs"; nevertheless, defendant instructed Mrs. McClary "not to change the bandage or bother [it] at all . . . [defendant] would do that herself."

**2.** A "second-degree burn" is defined as a burn marked by pain, blistering and superficial destruction of dermis with edema and hyperemia of the tissues beneath the burn.

The severity of the burns is difficult to articulate, but is readily apparent upon inspection of the photographs received in evidence. The act of bathing a small child is not very complicated; however inexperienced defendant was, she had had her child in custody for almost a year and the photographs strongly tend to indicate the victim was not burned accidentally. It was for the jury, of course, to decide whether the burns were inflicted accidentally or intentionally, but the evidence supports an inference that the defendant assaulted her child by immersing her twice in very hot water.

 Counsel has complained, indirectly, that evidence of the long-bone fractures and evidence demonstrating the victim had been scalded was inadmissible and should not be considered here. We do not agree. As noted in *State v. Morris, supra,* the State's obligation—with respect to the second element of the corpus delicti—was to show that the fatal injury was not self-inflicted, nor due to natural causes or accident. *State v. Meidle, supra,* 202 S.W.2d at 81. Proof of the long-bone fractures went to negative these possibilities and was properly received. We also believe the proof of defendant's commission of a separate, distinct crime—an assault upon her daughter—was admissible in this case. Proof of other, distinct offenses is generally not admissible in criminal cases unless such proof has some legitimate tendency to establish the very crime with which the defendant is charged, but there are exceptions to this rule and the exceptions are as well established as the rule. *State v. Reese,* 364 Mo. 1221, 1226, 274 S.W.2d 304, 307 (banc 1954); *People v. Molineux,* 168 N.Y. 264, 61 N.E. 286, 294 62 L.R.A. 193, 237–240 (1901). "[When] the proof of other offenses may tend to establish motive, or intent, or absence of accident or mistake, or identity of the defendant, *or a common scheme or plan embracing the commission of separate similar offenses so interrelated to each other that proof of one tends to establish the other, such other offenses are widely held . . . to be admissible in proof.*" (Our emphasis). *State v. Lunsford,* 338 S.W.2d 868, 872 (Mo.1960); 2 J. Wigmore, Evidence § 304, p. 249 (Chadbourn rev.1979). In the case at hand, the evidence unmistakably shows a series of interrelated assaults upon the infant victim, the last of which was fatal. Evidence concerning the infliction of second-degree burns by the defendant was relevant, admissible, and had a logical tendency to prove defendant's guilt. Moreover, the defendant's evasiveness, her contradictory statements concerning the origin of the victim's injuries and her attempts to conceal or minimize those injuries could reasonably be taken as indicia of guilt. *State v. Concelia,* 250 Mo. 411, 421, 157 S.W. 778, 780[2] (1913); 2 J. Wigmore, *supra,* § 273, p. 115.

 A further circumstance which has some probative weight in this case is defendant's presence at the time the crime was committed and her opportunity to commit the crime. There was evidence here, as in *State v. Morris, supra,* that defendant and Morris were living together in a two-room house at 215 South Douglas Street in Springfield. Morris testified in this case that he spent "the biggest part of the day" with defendant. "Around noon" on March 18, 1975, Morris, the defendant and the victim left the house and went to "a library, liquor store and home." Morris, defendant and the victim got "home" about 4 p. m., and Morris "laid down" in one of the two rooms. Defendant put the victim in her crib in the other room and went outside to a privy. According to Morris, he was still lying down when the defendant came back into the house and went into the victim's room. Shortly thereafter, the victim's condition became critical; Morris and the defendant took her to the hospital. It is axiomatic that the mere presence of an accused at the scene of a crime and an opportunity to have committed the offense is not of itself sufficient to justify conviction. *State v. Castaldi,* 386 S.W.2d 392, 395 (Mo.1965). Nevertheless, this is not a "mere bystander" case like *State v. Castaldi, supra,* and *State v. Bush,* 547 S.W.2d 517 (Mo.App.1977). The evidence, albeit circumstantial, indicated that defendant "associated [herself] with the venture," and

" 'consciously shared' in the criminal act." See *State v. Colthorp, supra*, 437 S.W.2d at 77. We conclude that the circumstantial evidence tending to establish the defendant's criminal agency, while it scarcely deserves the State's characterization as "overwhelming," is sufficient to satisfy the demands of due process. The trial court did not err in denying the defendant's motion for judgment of acquittal made at the close of all the evidence.

The next point which must be given consideration is defendant's complaint that the State's Instructions 7 and 8 were prejudicially erroneous. Instruction No. 7 is MAI–CR 2.10 appropriately modified, and it reads as follows:

"All persons are guilty who knowingly act together with the common purpose of committing an offense, or who knowingly and intentionally aid or encourage another in committing it, and whatever one does in furtherance of the offense is the act of each of them.

The presence of a person at or near the scene of an offense at the time it was committed is alone not sufficient to make her responsible therefor, although her presence may be considered together with all of the evidence in determining her guilt or innocence."

Instruction No. 8 is MAI–CR 6.06 in the form appropriate for use at the time this case was tried, modified so as to instruct upon the general responsibility of one person for the conduct of another by the addition of MAI–CR 2.12. As given, Instruction No. 8 read as follows:

"If you find and believe from the evidence beyond a reasonable doubt:

First, that on or about the 18th day of March, 1975, in the County of Greene, State of Missouri, the defendant or Robert Morris, caused the death of Kimberly Ann Matney by striking her, and

Second, that the defendant or Robert Morris intended to cause serious bodily harm to Kimberly Ann Matney, and

Third, that the defendant or Robert Morris did not do so in agitation suddenly provoked by the unexpected acts or conduct of Kimberly Ann Matney, and

Fourth, that the defendant acted either alone or knowingly and with common purpose together with Robert Morris in the conduct referred to in the above paragraphs, then you will find the defendant guilty of murder in the second degree.

However, if you do not find and believe from the evidence beyond a reasonable doubt each and all of the foregoing, then you must find the defendant not guilty of that offense.

If you do find the defendant guilty of murder in the second degree you will fix his punishment at imprisonment by the Division of Corrections for a term fixed by you, but not less than ten years nor more than life imprisonment."

As we followed the defendant's complaint, it is that there was no evidence that Morris struck the victim; Instruction No. 8 allowed the jury to speculate that he did, and encouraged speculation because it referred to "his" punishment after referring to "her" guilt. The defendant also maintains that Instruction No. 8 did not submit a finding of the intent required for conviction. To support this last contention, defendant cites *State v. Grebe*, 461 S.W.2d 265, 268[2] (Mo.banc 1970).

We agree with the State's position that *Grebe* is inapposite here. The narrow question presented in *Grebe* was how to submit an order of intent which is particularly difficult to impute to codefendants when the codefendants are friends or kindred. This defendant was not convicted of manslaughter; we are in doubt she could have been so convicted, because the victim was incapable of offering that degree of provocation which would reduce the crime charged to manslaughter. *State v. Wooley*, 215 Mo. 670, 677, 115 S.W. 417, 435 (1908).

█ As for the contention that the jury was allowed to speculate upon Morris' guilt as a participant, we find it equally unavailing. The former adjudication of Morris' guilt was not mentioned in the jury's presence, but there was indeed sufficient evidence to indicate his presence as an active

coparticipant. Upon the trial of this case, there was cogent evidence that the victim had been struck more than once about the head during the afternoon; the showing of Morris' presence when the offense was committed, the evidence of his close association with defendant, who thought she had become pregnant by her paramour, Morris' flight from the hospital before the investigating officer arrived, and evidence of his agreement to conceal the results of a prior assault upon the victim were circumstances which permitted an inference of his common intent as well as his participation in the fatal assault. See, generally, *State v. Reed*, 453 S.W.2d 946, 948 (Mo.1970); *State v. Hudson*, 508 S.W.2d 707, 709 (Mo.App. 1974); 2 J. Wigmore, Evidence § 276, p. 122 (Chadbourn rev.1979).

■ The complaint of the obviously inadvertent use of the possessive adjective "his" rather than the proper feminine adjective "her" is nit-picking of a high order. Conceding counsel's duty to raise the point if he considered it material, Rule 20.02(e) does not require grammatical perfection. *State v. Adams*, 531 S.W.2d 763, 764–765[2] (Mo.App.1975).

A further point which requires some analysis and consideration is defendant's assertion that she was denied due process because her "motion to dismiss or for appropriate relief" was not sustained by the trial court. On March 19, 1975, defendant was charged with mistreatment of a child as defined and denounced by former § 559.340, RSMo 1969. On April 25, 1975, an information was filed; on April 28, 1975, defendant was arraigned and pleaded not guilty. Three times thereafter, the cause was passed by agreement of the parties or of retained counsel. Finally, on August 18, 1976, defendant appeared with her present counsel and requested the circuit court to remand her cause for a preliminary hearing. Out of the hearing of the jury, defendant was asked if she understood that the State intended to file a "more serious" charge if the cause were remanded for a preliminary hearing. Defendant said she did. Defendant's first attorney and the prosecutor then testified before the court. The substance of their testimony, as we read it, is that defendant's original counsel tried to negotiate a plea bargain with the State, but the bargaining broke down. At the conclusion of the hearing, the cause was remanded for a preliminary hearing. Defendant was thereupon charged with second-degree murder. The magistrate found probable cause and bound defendant over. Upon arraignment on October 29, 1976, defendant's present counsel objected " . . . to even being arraigned on the charge for the reason it violates [defendant's] right to due process of law . . . and right to speedy trial."

■ To support her contention that the State, having once charged her with child mistreatment, could not thereafter charge her with murder, defendant cites *Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). That case, as we read it, squarely negates defendant's claim that her due-process rights were infringed when the second information was filed.

■ The delay between filing the original information and the trial, from April 25, 1975, to May 2, 1977, was for the most part the result of continuances agreed to and the defendant's resort to the writ of prohibition to attempt to prevent the prosecutor from filing the murder charge. We have examined the record carefully for any indication of prejudice to the defendant's ability to present her defense and for any indication of prosecutorial vindictiveness. We find neither, and indeed the sticking point in the plea bargaining negotiations seems to have been defendant's or her counsel's insistence that all prosecution be delayed or "deferred." For all the record shows, the State was ready to prosecute at any time. The record further indicates that since the death of her child, defendant has been incarcerated only a few days. In *Barker v. Wingo*, 407 U.S. 514, 530–532, 92 S.Ct. 2182, 2192–2193, 33 L.Ed.2d 101, 117–118 (1972), the court laid down a four-factor "balancing test" to determine whether or not a particular defendant has been deprived of his or her speedy trial rights. The factors were identified as: 1) length of delay; 2) reason

for the delay; 3) defendant's assertion of his right, and 4) prejudice to the defendant. The delay we find in this record is the result of a prolonged attempt to forestall the inevitable on the part of the defendant. Quite often such induced delay is a successful trial tactic. Here it was not, but its failure has given the defendant no reason to complain of an infringement of federally protected rights.

We have considered the other points advanced. As indicated, the development of those points indicate a diligent, conscientious compliance with the duties imposed upon counsel by *State v. Gates, supra.* The other points advanced give the court no cause to disturb the result reached. Accordingly, the judgment is affirmed.

BILLINGS, P. J., MAUS, J., and KELSO, Special Judge, concur.