STATE of Missouri,
Plaintiff-Respondent,

v.

Robert Earl PAYNE,
Defendant-Appellant.

No. 41184.

Missouri Court of Appeals,
Eastern District,
Division One.

Dec. 16, 1980.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Feb. 13, 1981.

Robert A. Hampe, St. Louis, for defendant-appellant.

John Ashcroft, Atty. Gen., Paul Robert Otto, Jay Haden, Kathleen Mills, Asst. Attys. Gen., Jefferson City, George Peach, Circuit Atty., St. Louis, for plaintiff-respondent.

DOWD, Judge.

Robert Earl Payne, defendant-appellant, was convicted by a jury of manslaughter, arising from the shooting death of his wife, Kadelia Payne. Defendant was sentenced under the second offender act to a term of ten years in the custody of the Missouri Department of Corrections.

On this appeal, defendant contends that the trial court erred in (1) overruling his motion for judgment of acquittal because the evidence was insufficient to support his conviction; and (2) permitting testimony relating to a blood sample obtained from the coroner's office because the state failed to establish a proper foundation and chain of custody for the sample.

Defendant contends that there was insufficient evidence to sustain the verdict of manslaughter. Specifically, defendant argues there was insufficient evidence to prove his criminal agency in the killing of Kadelia Payne. In reviewing the sufficiency of the evidence we accept as true all evidence in the record tending to support the jury's finding of defendant's guilt, together with all favorable inferences that can reasonably be drawn therefrom and disregard all contrary evidence and inferences. *State v. Morgan*, 592 S.W.2d 796, 805 (Mo. banc 1980). If there is substantial evidence to support the jury's finding, the verdict will not be disturbed. *State v. Crews*, 585 S.W.2d 131, 136 (Mo.App.1979).

The state must prove defendant's criminal agency, that is, a criminal act of the defendant which was a cause of the victim's death. *State v. Morris*, 564 S.W.2d 303, 309 (Mo.App.1978). Defendant's criminal agency may be proven by circumstantial evidence. *State v. Lenza*, 582 S.W.2d 703 (Mo.App.1979), *cert. denied*, 444 U.S. 1021, 100 S.Ct. 678, 62 L.Ed.2d 652 (1980); *State v. Morris, supra*. Where, as here, a conviction rests on circumstantial evidence, facts and circumstances to establish guilt must be consistent with each other, consistent with the hypothesis of defendant's guilt and inconsistent with and exclude every reasonable hypothesis of defendant's innocence. But the circumstances need not be absolutely conclusive of guilt or demonstrate impossibility of innocence, and the mere existence of other possible hypotheses is not enough to remove the case from the jury. *State v. May*, 587 S.W.2d 331, 334 (Mo.App.1979); *State v. Miceli*, 549 S.W.2d 113, 115 (Mo. App.1977).

On October 31, 1977 two police officers responded to a call concerning a shooting at a house in the City of St. Louis. Defendant and his wife, Kadelia Payne, lived in this house along with several other people. The police arrived at approximately 4 a. m. They entered the front door of the residence and observed Kadelia Payne in a sitting position on the floor, being supported from behind by defendant. Mrs. Payne was covered with blood and was making a moaning sound, but was unable to communicate. When the police asked defendant what happened he said, "I'm sorry, I'm sorry" and then told the police his wife had been shot by someone from outside. An ambulance arrived and took Mrs. Payne to the hospital. Defendant also went to the hospital.

While defendant was at the hospital the police examined the foyer area where the victim had been found and the area in front of the house. They found no evidence which would indicate that a gun had been fired from outside the house. Inside the house police found what appeared to be blood on the staircase leading upstairs. Subsequent police laboratory tests confirmed that this was human blood. Blood was found on the stairs all the way up to the third floor, and continued down the third floor hallway leading to a room at the end of the hall. Just inside the doorway to this room was a pool of blood with streaks of blood extending from the pool toward the hallway. Further inside the room was another accumulation of blood located on the floor in front of a dresser.

Defendant was returned to the home at the request of the police. Upon arrival, defendant told the police that he and his wife had been upstairs in their room when they heard a knock on the door. Defendant said that his wife went down to check it, then he heard a scream and came down to the first floor where he "found her like that." A .32 caliber revolver was found on top of a radiator in a room located off the foyer area from where the victim had first been observed by the police. More blood stains were discovered along the edge of the door to this room. In the revolver the police found six bullets. One of these bullets had been discharged. The discharged shell was immediately underneath the hammer of the weapon. No fingerprints were found on the gun. Defendant told the police that the gun was "ours."

Kadelia Payne died approximately three hours after having been admitted to the hospital. An autopsy was performed the following day, November 1, 1977. The pathologist who performed the autopsy concluded that the victim was killed as a result of a bullet wound to the head. The bullet had entered the victim's right temple, passed through both temporal lobes of the brain and was recovered from the skin of the opposite temple. The doctor testified that the victim would be incapable of performing any voluntary act after sustaining such an injury. There was no evidence that the bullet had been fired from close range, and the doctor stated that the victim was shot from a distance of more than twelve inches.

The bullet recovered from the victim's head and the revolver found in the first floor room were analyzed by the police firearms identification laboratory. A test bullet was fired from the weapon and compared to the bullet that caused the victim's death. Both bullets were .32 caliber. These bullets were examined for certain markings which are implanted on a bullet as it passes through the barrel of a weapon. Each bullet was marked with five lands and five grooves, and these lands and grooves were the same width for each bullet. Also, the recovered bullet was fired from a barrel with a right-hand twist and the test bullet had a right-hand twist. However, the recovered bullet was so mutilated that the police were unable to conclusively determine that the recovered bullet had been fired from the revolver found in the home.

■ When considered in its entirety the evidence supports the jury's verdict. The jury could reasonably find that the victim was intentionally killed, and that her death was not the result of accident or suicide. There was also sufficient evidence to support a finding of defendant's criminal agency in the death of the victim. Defendant's conduct following the commission of the offense was indicative of a consciousness of guilt and an attempt to remove suspicion from himself. There was no evidence of blood on any other person residing in the home, and blood was found only from the third floor bedroom down to the first floor foyer and on the door to the room where the gun was found. Defendant's initial response when the police arrived at his home was to say "I'm sorry, I'm sorry". The jury could readily find that defendant lied when he told the police his wife had been shot from outside when she went to answer the front door. No evidence was found which would indicate that a gun had been fired from outside. From the accumulations of

blood in the third floor room and the fact that the victim would be incapable of any voluntary act immediately after sustaining such an injury, the jury could infer that she was killed in the Paynes' bedroom and moved to the first floor foyer. The jury could conclude that the gun found in the house, which belonged to defendant and his wife, fired the bullet which caused the victim's death. We conclude that from the facts and circumstances presented in this case there was substantial evidence to support the jury's verdict finding defendant guilty of manslaughter.

Defendant next contends the trial court erred in permitting testimony by a police criminologist regarding a blood sample which was obtained from the City of St. Louis Coroner's office. The criminologist testified that the blood sample from the coroner's office and blood stains found on the shirt defendant was wearing when the police arrived were both type A in the ABO blood typing system and M–N in the M–N system. The defendant made timely objections to the testimony concerning the blood sample, arguing that the state failed to establish a proper foundation and chain of custody for the sample. Defendant asserts that admission of this testimony constituted prejudicial error because that evidence established his criminal agency in the offense charged.

Joseph Crow, the criminologist, testified that he picked up the blood sample from the coroner's office and transported it to the police laboratory. Crow personally analyzed the blood sample and conducted the blood typing test. At trial, the state questioned Crow concerning his findings over defendant's foundation and chain of custody objections. The trial court overruled the objections subject to the condition that the doctor who obtained the blood sample at the coroner's office connect up the sample to Crow's testimony. Crow had signed a receipt for the sample, but this receipt was never produced during trial. Crow never testified that the blood sample contained any identification marks which indicated that this sample was the victim's blood.

Dr. William Drake, a pathologist and medical examiner with the City Examiner's Office, performed an autopsy on the victim on November 1, 1977. Because the victim had apparent needle marks on her arms, the doctor performed a toxicological screen to test for the presence of drugs. When asked whether a blood sample had been removed from the victim and forwarded to the laboratory, Dr. Drake replied, "Yes, I removed—I obtained blood for the tox." This was the doctor's only reference to the blood sample.

■ Defendant argues that the state did not establish a complete chain of custody from the time the blood sample was taken and thereby failed to show that the sample tested by Crow was taken from the victim, because Dr. Drake's testimony did not indicate that a blood sample from the victim was forwarded to the police laboratory. In establishing a chain of custody, there is no requirement to account for the hand-to-hand custody of the evidence between the time it is obtained and the time it is admitted to trial. *Thompson v. State*, 582 S.W.2d 700, 702 (Mo.App.1979); *State v. Russ*, 537 S.W.2d 216, 219 (Mo.App.1976). The chain of custody requirement is utilized to insure that the evidence originally obtained in the same evidence which is sought to be introduced at trial. *See, State v. Roper*, 591 S.W.2d 58, 61 (Mo.App.1979); *State v. Hardy*, 568 S.W.2d 86, 87 (Mo.App. 1978); *State v. McClain*, 536 S.W.2d 45, 47 (Mo.App.1976). In this case, the evidence must demonstrate with reasonable assurance that the blood sample which came from the coroner's office was actually taken from the victim.

■ Here, the response by Dr. Drake to establish the chain of custody for the blood sample was equivocal. However, even assuming that the admission of the testimony relating to the blood sample was erroneous, such error would be harmless without question. The criminologist testified that both the blood on defendant's shirt and the blood sample from the coroner's officer were types A and M–N. The jury could reasonably infer that the sample was taken from

the victim since it had come from the coroner's office. Nevertheless, there is no merit in defendant's assertion that this testimony established his criminal agency.

When the police first arrived at the home the victim was in a sitting position on the floor and the defendant was supporting her from behind. One police officer testified the victim was leaning on defendant. When asked at trial whether this caused the victim to bleed upon defendant the officer responded, "Yes, I guess. She had blood all over." Another officer testified that the victim's clothing was blood soaked in spots. Both officers at trial identified the blood stained shirt examined by the criminologist as the shirt defendant was wearing when they arrived. It would come as no surprise that the blood on the defendant's shirt was the victim's blood.

Because defendant had removed the blood stained shirt before departing the hospital and left it lying behind the door to the third floor room, defendant argues that the jury may have inferred he was trying to conceal incriminating evidence. However, this hypothesis is refuted by the record. There was testimony that defendant had asked if he could change his shirt before going to the hospital and that he went upstairs to change. Several police officers acknowledged that the defendant had gone upstairs to change shirts, and there could be no inference he tried to conceal this shirt. Finally, while defendant told the police his wife had been shot by someone from outside the house, admission of the testimony relating to the victim's blood type did not create any inconsistency with defendant's explanation of what occurred. Clearly, the testimony relating to the blood sample did not result in any prejudice to the defendant.

Judgment affirmed.

STEPHAN, P. J., and STEWART, J., concur.